**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**TOMMY L. HAMILTON,**

**Plaintiff,**

**v.** **00-CV-300SR**
**00-CV-863SR**

**NIAGARA FRONTIER TRANSPORTATION AUTHORITY,**
**CHARLES MARTHA,**
**NORMAN J. BIRNER, and**
**WILLIAM McGEE,**

**Defendants.**

---

## DECISION AND ORDER

In accordance with 28 U.S.C. § 636(c), the parties have consented to have the undersigned conduct all further proceedings in this consolidated case, including entry of final judgment. Dkt. #14 & Dkt. #20.

Currently before the Court is defendants' motion for summary judgment. Dkt. #67. For the following reasons, defendants' motion is granted in part and denied in part.

## BACKGROUND

Upon the recommendation of Chief of Police Birnir, plaintiff was sworn in as a Transit Police Officer for the Niagara Frontier Transportation Authority ("NFTA"), on November 13, 1996. Dkt. #69, ¶ ¶ 1 & 30; Dkt. #78, ¶ ¶ 1 & 30. The NFTA is a

public benefit corporation organized and existing pursuant to New York's Public Authorities Law § 1299 *et seq*. Dkt. #69, ¶ 2; Dkt. #78, ¶ 2. Pursuant to the Collective Bargaining Agreement ("CBA"), between the Police Benevolent Association ("PBA"), and the NFTA, all new police officers were subject to a probationary period of eighteen months. Dkt. #67, Exh. I; Dkt. #70, ¶ 5. Probationary employees cannot grieve discipline pursuant to the CBA. Dkt. #70, ¶ 5.

On June 2, 1997, plaintiff received his six month evaluation which indicated an unsatisfactory attendance and on-time record, but otherwise satisfactory performance. Dkt. #67, Exh. J. On July 18, 1997, plaintiff received a one day suspension and referral to the Employee Assistance Program as discipline for repeated attendance/tardiness violations. Dkt. #67, Exh. J. On September 5, 1997, plaintiff sent Chief Birner the following correspondence:

> Sir, Hopefully these reports will give you a brief if not better idea as to what has been going on w/ my situation regarding my sons. I am taking care of business w/ the best resources I can think of but would appreciate any positive input you can spare or other people you may think can help.

Dkt. #67, Exh. K. Plaintiff attached a copy of his petition for modification of custody of his son to his care because of the mother's substance abuse and endangerment of the child, including physical abuse of the child. Dkt. #67, Exh. K.

By memorandum dated September 26, 1997, plaintiff requested that Chief Birner and Lt. Martha schedule his class for pepper spray training and for his Hepatitis B shots. Dkt. #77, Exh. G. Plaintiff advised his superiors that he believed he was "the

only one without the shots and definitely the only officer not issued pepper spray." Dkt. #77, Exh. G.

By memorandum dated January 7, 1998, plaintiff requested that Chief Birner and Lt. Martha provide training for OCC/Radio because he was recently passed over for overtime due to his lack of training, despite the fact that less senior officers were recently sent for training. Dkt. #77, Exh. G. Plaintiff also advised his superiors that he was "still waiting" for his Hepatitis B shots and pepper spray training. Dkt. #77, Exh. G.

By memo dated January 13, 1998, plaintiff requested time off with or without pay to attend to the needs of his son. Dkt. #67, Exh. K. Plaintiff advised Chief Birner that

> I have been continuously informing you, as well as Lt. Martha about my custody battle for my son and my concerns in reference to his health & safety (along w/ his 9 yr. old sister, Kentrel).
>
> Last wk. I had to take another 3 hr. emergency [personal leave] to take him to the Dr's office to follow-up an Emergency Rm. visit for a dislocated elbow Dec 24, while I was working. I was never informed about this happening to him. Within the last 7 wks. I have used 7 hrs PL to take my son to emergency Dr. visits and within the last 10 wks., my son has been seriously hurt 5 of those wks. all of which required ER visits or Dr. office. All of which has been happening since having her arrested the last time the kids were left home alone 8/26/97.
>
> My son's Dr. has now expressed her concerns about these incidents also advised that she has contacted C.P.S., which increases my concern. I gave you information in September about my situation asking you for help, but I haven't heard anything from you.

> I know I have only been here 14 months today and I have on[ly] 9 hrs. PL. left, but I need time off from work, to take care of him now before something happens to him or his sister, as I'm willing to do this without pay! I have asked Lt. Martha since he does schedules, be he has refused saying "I can't be off without pay I can't be off because of schedules etc."
>
> I really need to take care of this situation and feel I'm forced to chose between my job or my son. With all due respect . . . My son comes 1st. Please help A.S.A.P.

Dkt. #67, Exh. K. Despite these letters, Chief Birner denied that plaintiff ever asked him for FMLA leave. Dkt. #67, Exh. F, pp.30 & 38. Diane Ruszala, Director of Human Resources for the NFTA and William McGee, Manager of Human Resources for the NFTA during the relevant time period, also deny any knowledge of any request for FMLA leave by plaintiff, but note that plaintiff was allowed sick or personal leave on numerous dates throughout his employment. Dkt. #70, ¶¶ 22-23; Dkt. #72, ¶ 5.

Plaintiff affirms that he was never advised of his rights pursuant to the FMLA, and that if he had been afforded FMLA, he would not have been characterized as presenting "attendance problems." Dkt. #77, ¶ 11.

On March 29, 1998, plaintiff sustained a left ankle injury as he struggled to subdue a suspect resisting arrest. Dkt. #67, Exh. C, p. 8 & Exh. L. Plaintiff speculates that he would not have been injured had he been able to use pepper spray to subdue the suspect. Dkt. #77, ¶ 13. Plaintiff affirms that he had requested pepper spray training, orally and in writing, numerous times, and was the only officer who had not received the training. Dkt. #77, ¶ 13.

Plaintiff was treated and released from ECMC with instructions to follow up with his treating physician, Dr. Cange, who examined plaintiff on March 31, 1998 and diagnosed a severe ligament strain of his ankle. Dkt. #67, Exh. C2, p.3. She excused plaintiff from work pending further evaluation on April 7, 1998. Dkt. #67, Exh. C2, p.3. Dkt. #67, Exh. C, p.10 & Exh. D, pp.69-70 & Exh. L. When plaintiff delivered medical documentation to Lt. Martha on either April 2nd or 3rd, he testified that Lt. Martha instructed him to attend a mandatory Rail Familiarization Training Session on Sunday, April 5th. Dkt. #67, Exh. D, p. 73; Dkt. #77, ¶ 16. Lt. Martha testified that he wouldn't expect an officer on disability to show up for the training. Dkt. #67, Exh. C2, p.47 & Exh. E, p.66.

On Sunday, April 5, 1998, Lt. Martha observed plaintiff climbing stairs during the training exercise at the Delevan Station. Dkt. #67, Exh. C2, pp.39-40 & Exh. E, p.79. Lt. Martha also observed plaintiff arrive at the station on a motorcycle. Dkt. #67, Exh. C,2, p.41 & Exh. E, p.69. Plaintiff testified that he attended the training with his cane and denied riding a motorcycle. Dkt. #67, C2, p.59; Dkt. #77, ¶ 16. He also notes that no one else has confirmed Lt. Martha's observation of plaintiff riding a motorcycle. Dkt. #77, ¶ 16.

On April 7, 1998, Dr. Cange examined plaintiff and continued his disability status, noting "no work until re-evaluation in 2 weeks 4/21/98." Dkt. #67, Exh. C2, p.4 & Exh. M.

Following his observation of plaintiff at the training, Lt. Martha conferred with the Chief, who directed Lt. Martha to contact the doctor's office to see if plaintiff would be able to work light duty. Dkt. #67, Exh. C2, p.41. Lt. Martha spoke to the nurse, who conferred with the physician and faxed him a note permitting plaintiff to perform light duty. Dkt. #67, Exh. C2, p.42 & Exh. E, p.77. Dr. Cange confirms that on April 9, 1998, she consulted with her licensed practical nurse, Audrey Evans, and advised her that plaintiff could perform light duty work. Dkt. #67, Exh. C2, p.11. As a result, the nurse faxed the following document to Lt. Martha:

> 4/9/98
>
> To: Lt. Martha
>
> RE: Tom Hamilton
>
> The above named pt has been seen for a work related accident. He will be re-evaluated in 2 weeks, but if a light duty position such as clerical, desk work sitting down is available he may be put on light duty until seen in the office again.
>
> Jean Congi, MD/ALE LPN

Dkt. #67, Exh. N. Dr. Cange's officer did not discuss this change in status with plaintiff because it was her understanding that "his employer was to contact him." Dkt. #67, Exh. C2, p.12; Dkt. #77, Exh. J. This is the only time that Lt. Martha has contacted a physician regarding an officer. Dkt. #67, Exh. E, p.79.

Lt. Martha conferred with the Chief, who agreed that plaintiff should be required to answer phones at the OCC. Dkt. #67, Exh. E, p.82. Lt. Martha distinguished answering phones from other dispatch duties which would require

training. Dkt. #67, Exh. E, p.36. Lt. Martha testified that he left a message for plaintiff on his answering machine. Dkt. #67, Exh. C2, p.42.

On April 9, 1998, plaintiff received a partial telephone message on his answering machine from Lt. Martha. Dkt. #67, Exh. C, p.11. Plaintiff testified that he attempted to call the Department that day, but received no response, so he called Dispatch. Dkt. #67, Exh. C, p.11. Plaintiff spoke to Officer Bullock at Dispatch, who instructed him to contact Lt. Martha, because he was unaware of the reason for Lt. Martha's call. Dkt. #67, Exh. C, p.12. Officer Bulluck testified that he informed plaintiff that

> he had been put on the duty roster, or was about to be put on the duty roster for light duty and OCC [Officer Communication Center]. I believe Tommy, at that time, informed me that he was still on a medical status or Compensation, whatever; and I told him I didn't know. That was the rumor. The lieutenant was trying to get in contact with him. The best thing would be for him to call the lieutenant.

Dkt. #67, Exh. C2,[1] p.24. A tape recording of this conversation was played at the Workers' Compensation hearing. Dkt. #67, Exh. C2, p. 25. The transcript of the tape indicates that Officer Bullock informed plaintiff that "you got to talk to one of the Sergeants I think they are going to put you on light duty." Dkt. #67, Exh. O. When plaintiff indicated that "it was the Lieutenant that called," Officer Bullock informed plaintiff that "he won't be in until tomorrow morning . . . 7 to 3 so give him a call then." Dkt. #67, Exh. O. When plaintiff informed Officer Bulluck that his "doctor said no work,"

[1] Exhibit C contains transcripts from two days of testimony. C2 references the second transcript.

Officer Bulluck responded, “I guess they talked to your doctor.” Dkt. #67, Exh. O. Officer Bulluck then informed plaintiff

> This is what I’ve heard, the rumor, so don’t go about what I am saying. Your best bet is to call the Lieutenant in the morning and talk to him and he will tell you exactly what he wants, you know it may not be that at all.

Dkt. #67, Exh. O.

Plaintiff testified that he attempted to call Lt. Martha on April 10, 1998, but was not successful. Dkt. #67, Exh. C, p.12 & Exh. C2, p.67 & Exh. D, p.86. Plaintiff affirms that he tried to contact Lt. Martha three times on or about April 10, 1998, but was never able to reach him. Dkt. #77, ¶ 22. Chief Birner affirms that

> incoming calls to the NFTA at this point in time would “jump” to other lines if not picked up. Additionally, if someone did not answer their phone, police officers could and often would call the OCC, where a dispatcher was on duty 24 hours per day. Therefore, it would have been very difficult and extremely unusual for someone to call in to the NFTA and not be able to get a live person. That would be practically impossible if the individual made several phone calls.

Dkt. #71, ¶ 30.

Plaintiff further explains that

> Also, later that day on April 10, 1998, I received a notice from the Lockport District Attorney’s Office to be in Court on April 14, 1998 regarding [a case]. At this point, I though that the attempted phone contact from Lt. Martha was regarding this court appearance for several very good reasons: (1) Lt. Martha knew of this incident and the resulting court proceedings; (2) no one had attempted any further contact with me at my main number or any of my emergency contact numbers; (3) Officer Bulluck said he was unsure about

> [what] Lt. Martha was calling about, referring to it as a 'rumor'; (4) I had never heard anything from my doctor's office regarding a change in my work status; (5) then this notice . . . arrived in the mail and (6) previously, when hurt, I had never been assigned to light duty nor had anyone call [sic] me to order me to report to work to do light duty.

Dkt. #77, ¶ 22 & Exh. M. Plaintiff also affirms that he went to police headquarters on April 11, 1998 to get some personal belongings from his locker and did not find any notes for him in his mail slot. Dkt. #77, ¶ 23. Plaintiff explains that he realized later that he was having problems with his answering machine, but notes that the NFTA had alternate telephone numbers at which they could reach him. Dkt. #77, ¶ 23 & Exh. L.

Plaintiff appeared in his capacity as an NFTA officer at Lockport City Court on April 14, 1998 as directed by the district attorney. Dkt. #77, ¶ 24.

Plaintiff received a telephone call from his sister on April 14, 1998 informing him that Officer Losi was trying to contact him. Dkt. #67, Exh. C, p.12, p. 51-52. Plaintiff returned Officer Losi's call and was informed that the NFTA had been trying to contact him. Dkt. #67, Exh. C, pp.53-54. While awaiting a return call from Officer Losi, plaintiff spoke to Sergeant DiFranco, who informed him that he was suspended for failing to report to work. Dkt. #67, Exh. C, p.54-59; Exh. C2, p.33-34. By memorandum dated August 18, 1998, Sergeant DiFranco reported that

> On April 14, 1998 at approximately 2:30 pm when I started my shift I attempted to contact P.O. Hamilton via the telephone with negative results. After 2:30 pm I tried to contact P.O. Hamilton via the telephone every half hour with negative results. At approximately 3:40 pm I called P.O. Hamilton's residence rang the telephone once and hung up.

> I immediately [redialed] P.O. Hamilton's residence and after the second ring P.O. Hamilton did pick up the telephone.
>
> I explained to P.O. Hamilton that the department has been trying to contact him since he spoke with Dispatcher P.O. H. Bulluck on April 9, 1998 who informed P.O. Hamilton to contact Lt. Martha the next day in regard to his light duty status. I also informed him that myself and Sgt. Herritage had left numerous telephone messages on his answering machine to contact the department. P.O. Hamilton was told that he was suspended without pay for failure to comply with [the] Chief's orders . . .
>
> Officer Hamilton stated to this sergeant that he never received any of our messages left on his answering machine and that he will contact his union representative in regard to this matter.

Dkt. #67, Exh. P. Plaintiff appeared at work on the evening of April 14th to receive the disciplinary paperwork and turn in his shield and gun. Dkt. #67, Exh. C, p.59-60.

On April 20, 1998, plaintiff was examined by Dr. Cange's partner, Dr. Bassig, who noted no change in his condition. Dkt. #67, Exh. C2, p.5. Plaintiff delivered the medical report to the NFTA between April 21 & 24, 1998, but the Medical Department did not receive this document. Dkt. #67, Exh. C, p.17.

Although defendants took the position that plaintiff was not entitled to a disciplinary hearing or human resources review or arbitration because plaintiff remained a probationary employee, Chief Birner afforded plaintiff a disciplinary hearing on April 24, 1998 because he wanted to hear plaintiff's side of the story. Dkt. #67, Exh. F, p.28. Plaintiff was represented by an attorney for the Police Benevolent Association. Dkt. #67, Exh. C, p.62. Chief Birner afforded plaintiff the opportunity to resign and, when

plaintiff declined, recommended that plaintiff be terminated. Dkt. #67, Exh. F, p.36 & Exh. R. Plaintiff was terminated effective April 24, 1998. Dkt. #67, Exh. R. During the thirteen months from his date of hire to his injury on duty, plaintiff was tardy, sick and used personal time at least 42 times. Dkt. #67, Exh. T.

The following week, Dr. Cange examined plaintiff and referred him to an orthopedic specialist, Dt. Luzi. Dkt. #67, Exh. C2, p.5; Dkt. #77, Exh. K. Dr. Luzi prescribed four weeks of physical therapy. Dkt. #67, Exh.C2, p.6. Plaintiff was released to work without restriction on June 8, 1998, the same day he received his notice of termination. Dkt. #67, Exh. C, pp.17 & 30; Dkt. #77, Exh. K.

Plaintiff filed a complaint with the United States Department of Labor on June 8, 1998. Dkt. #77, Exh. A, ¶ 34. The investigator determined that the NFTA had violated numerous provisions of the FMLA, including: (1) lack of FMLA postings; (2) lack of notification of FMLA rights following his injury; (3) demanding that plaintiff accept light duty; (4) terminating plaintiff while on FMLA protected leave; and (4) failing to reinstate plaintiff when he was medically cleared to return within the 12-week period. Dkt. #77, Exh. B. The investigator noted that neither Chief Birner or Lt. Martha "had any idea what the FMLA was nor what notification was required." Dkt. #77, Exh. B. The investigator informed William McGee "that the NFTA had violated several requirements of FMLA, most notably terminating Hamilton while he was on protected status recovering from his injury (a qualifying serious health condition)," and requested that plaintiff be "restored to his job and made whole." Dkt. #77, Exh. B.

On April 6, 2000, plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR"), which was also accepted on behalf of the EEOC, charging defendants with a discriminatory practice in violation of New York's Executive Law because of disability, race and color. Dkt. #67, Exh. U. Specifically, plaintiff alleged that

> During my employment, I have been subjected to differential treatment because of my race and color; I was the only black officer on my shift. For example, I was the officer most frequently assigned to the least desirable shifts/locations, including coverage of the 5 p.m. to 1 a.m. shift, the bus terminal (these assignments also result in less pay), and the Utica train station. Less senior, white officers, Demming, Insalaca and Clifford, were also given OCC (radio) training, which was denied me, and pepper spray training, which was denied me, despite repeated requests.

Dkt. #67, Exh. U. The NYSDHR found no probable cause to believe that the NFTA engaged in discriminatory conduct, explaining that their

> investigation revealed that complainant, a probationary employee, was terminated for failing to respond to respondent's efforts to return him to work on light duty, and prior problems with work performance and attendance. Complainant's witness stated that difficulty obtaining some training was due to cost concerns and had nothing to do with race, color or disability. The record shows that 12 of respondent's 70 officers are black, and respondent has recently promoted 3 black officers. The record also shows respondent prefers to return disabled employees on light duty. Complainant's witness indicated that assignment to work at Utica station has been traditionally used for officers, without regard to race or color, who require additional supervision. Complainant's witnesses did not support his claim of race or disability discrimination. The evidence does not support a belief that complainant was treated differently, or was terminated, because of his race, color or disability.

Dkt. #67, Exh. V.

On April 10, 2000, plaintiff filed a complaint asserting violations of the Family and Medical Leave Act ("FMLA"), and New York General Municipal Law § 207-c. *See* 00-CV-300.

The EEOC adopted the determination of the NYSDHR and issued a dismissal and notice of suit rights on July 10, 2000. Dkt. #67, Exh. V.

On April 24, 2000, the United States Department of Labor received a complaint from plaintiff regarding the NFTA's failure to provide him with Hepatitis B vaccination or personal protective equipment, *to wit*, pepper spray. Dkt. #77, Exh. P. Following an investigation, the Department of Labor issued a Notice of Violation and Order to Comply citing the NFTA for, *inter alia*, failing to determine if hazards were present which would necessitate use of personal protective equipment and failing to make the Hepatitis B vaccination series available within 10 working days of plaintiff's assignment to patrol duties. Dkt. #77, Exh. P.

On October 10, 2000, plaintiff filed a separate complaint asserting violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"); the Americans with Disabilities Act of 1990, 42 U.S.C.A. § 12101 *et seq*. ("ADA"), and the New York State Human Rights Law, Article 15 of the New York State Executive Law ("NYSHRL"). *See* 00-CV-863. The actions were consolidated into an amended complaint on August 31, 2001.

In the amended complaint, plaintiff complained that he received less favorable patrol assignments than less senior Caucasian officers; requested but did not receive the Hepatitis B shot; and requested, but did not receive, training to permit him to carry pepper spray. Dkt. # 69, ¶¶ 32-34. In response to these allegations, Chief Birner affirmed that hepatitis B shots are not required for police officers, but were made available on occasion for officers who wanted them when a group of officers requested them. Dkt. #71, ¶ 10. Chief Birner affirmed that plaintiff was not the only police officer who had not received a hepatitis B shot, including Caucasian police officers. Dkt. #71, ¶ 19. Chief Birner also affirmed that pepper spray was available for police officers who had been certified in its use, but that officers suffered no loss of pay, seniority, opportunities or other benefit if they lacked certification. Dkt. #70, ¶ 11. Chief Birner averred that it was his understanding that plaintiff was certified to use pepper spray, but had not produced the certificate. Dkt. #70, ¶ 17.

On December 19, 2001, the Workers' Compensation Board found that plaintiff had not submitted sufficient evidence to demonstrate that he was discharged in retaliation for exercising his rights under the Workers' Compensation Law. Dkt. #67, Exh. W. Specifically, the Board determined that

> It is clear from the record that the employer did have a legitimate business reason for discharging the claimant, based upon the work related issues, coupled with the claimant's past history of violation of the Department's rules and regulations. It was the claimant's conduct in failing to follow rules, regulations and directions of his superior officer, and not the filing of a Workers' Compensation claim, which led to the claimant's loss of employment.

Dkt. #67, Exh. W.

## DISCUSSION AND ANALYSIS

**Summary Judgment Standard**

___________Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff." *Thomas v. Irvin*, 981 F. Supp. 794, 799 (W.D.N.Y. 1997) (internal citations omitted). ________

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982. A party seeking to defeat a motion

for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

**Collateral Estoppel**

Defendants argue that plaintiff is precluded from pursuing his Title VII, ADA & FMLA claims by the determination of the Workers' Compensation Board that "the employer did have a legitimate business reason for discharging the claimant." Dkt. #68, pp.26-29. It is clear, however, that prior administrative findings are not entitled to preclusive effect in Title VII proceedings unless the administrative finding is challenged and decided in state court, resulting in a state court judgment on the same claim or issue. *See University of Tennesee v. Elliott*, 478 U.S. 788, 795-96 (1986)*; Raniola v. Bratton*, 243 F.3d 610, 623-24 (2d Cir. 2001). Because the ADA incorporates the procedural requirements of Title VII, state administrative proceedings which are not reviewed by a state court would not have preclusive effect on an ADA claim either. *See Kasakow v. New Rochelle Radiology Assocs*., P.C., 274 F.3d 706, 735 (2d Cir. 2001); *Greenberg v. New York City Transit Auth*., 226 F. Supp.2d 225, 240-41 (E.D.N.Y. 2004) (no preclusive effect to Workers' Compensation Board determination that employer discriminated against plaintiff). In *Kasakow*, the Court of Appeals for the Second Circuit also determined that a determination by a state administrative agency that plaintiff was terminated for a legitimate business reason did not collaterally estop plaintiff from

claiming termination in violation of the FMLA. 274 F.3d at 727-36. Accordingly, the Workers' Compensation Board determination does not preclude plaintiff's Title VII, ADA or FMLA claims.

**Title VII Claim**

Defendants argue that plaintiff's complaints of inferior assignments and denial of pepper spray training and hepatitis B vaccination do not constitute adverse employment actions. Dkt. #68, p.21-22. In any event, defendants assert that plaintiff has failed to demonstrate that these complaints or his termination were based upon his race. Dkt. #68, pp. 22-26.

Plaintiff responds that he was subjected to numerous adverse employment actions and that circumstantial evidence supports his claim of discriminatory treatment and termination. Dkt. #79, p.23.

Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In the absence of direct evidence of discrimination, Title VII claims are analyzed pursuant to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, and its progeny. 411 U.S. 792, 802 (1973).

A *prima facie* case of disparate treatment is established by showing that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was otherwise qualified for the position; (3) an adverse employment action was taken; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination on the basis of his membership in that class. *See Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981). A *prima facie* case of discriminatory discharge is established by demonstrating that: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was discharged; and (4) his discharge occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class. *Slattery v. Swiss Reinsurance America Corp.,* 248 F.3d 87, 91-92 (2d Cir.), *cert. denied*, 534 U.S. 951 (2001); *Chambers v. TRM Copy Centers Corp*., 43 F.3d 29, 37 (2d Cir. 1994). Although plaintiff's burden in this regard is *de minimis*, the proffered evidence must still show circumstances that would be sufficient to permit a rational finder of fact to infer that each of these elements has been met. *McLee v. Chrysler Corp.*, 109 F.3d 130, 134-135 (2d Cir. 1997) (citing cases). Evidence of discrimination is not required. *James v. New York Racing Assoc.*, 233 F.3d 149, 153 (2d Cir. 2000).

If plaintiff meets this initial burden and establishes a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. *Id.; see Burdine,* 450 U.S. at 254. "Any such stated purpose is sufficient to satisfy the defendant's burden of production; the employer does not have to persuade the court

that the stated purpose was the actual reason for its decision." *Austin v. Ford Models, Inc.*, 149 F.3d 148, 153 (2d Cir. 1998), *abrogated on other grounds by Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 509 (2002).

If the employer carries this burden of production, the presumption raised by the *prima facie* case is rebutted and "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993). At this point, the case "becomes like any other case in that the plaintiff[s], in order to prevail, must have evidence from which the factfinder can reasonably find the essential elements of the claim." *James*, 233 F.3d at 154. Accordingly, in the context of a motion for summary judgment, the Court must examine the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendants intentionally discriminated against him. *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000). The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendants were false, and that more likely than not discrimination was the real reason for the employment action. *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir. 2000), *cert. denied,* 540 U.S. 811 (2003).

In the instant case, the defendants argue that plaintiff's lack of pepper spray training and hepatitis B vaccination did not affect the compensation, terms, conditions, or privileges of plaintiff's employment because they were not required for the position. However, federal regulations require that an employer make the hepatitis B

vaccination available to all employees with occupational exposure, such as police officers, within 10 working days of initial assignment. 29 C.F.R. § 1910.1030. Federal regulations also require that employers assess the workplace and provide personal protective equipment, such as pepper spray, when an employee, such as a police officer is likely to be exposed to potentially violent situations. 29 C.F.R. § 1910.132. Accordingly, it is the opinion of this Court that defendants' failure to provide these items adversely affected the terms and conditions of plaintiff's employment. Defendants have proffered no legitimate reason for their failure to provide these items to plaintiff despite his multiple requests or any evidence, other than Chief Birner's unsupported affirmation, that they similarly failed to provide these items to officers outside of plaintiff's protected class. In addition, defendants have proffered no legitimate reason for their failure to afford plaintiff OCC/Radio training when less senior white officers allegedly received such training. These actions, combined with defendants' unorthodox handling of plaintiff's disability status, *to wit*, Lt. Murtha allegedly ordering plaintiff to attend Rail Familiarization Training despite a medical excuse from work and then personally contacting plaintiff's treating physician to obtain clearance for his return to light duty assignment, warrant denial of defendants' motion for summary judgment on plaintiff's first cause of action asserting race discrimination.

**<u>Election of Remedies regarding New York Human Rights Law</u>**

Defendants argue that plaintiff's claim pursuant to the New York Human Rights Law must be dismissed because plaintiff raised his claims of race and disability discrimination before the New York State Division of Human Rights. Dkt. #68, pp.6-8.

Plaintiff believes that he should be permitted to proceed with his state law claim because the investigation by the NYSDHR was incomplete. Dkt. #79, p.4.

New York's Executive Law provides that

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction . . . unless such person had filed a complaint hereunder or with any local commission on human rights . . . provided that, where the division has dismissed such complaint on the grounds of administrative convenience, on the grounds of untimeliness, or on the grounds that the election of remedies is annulled, such person shall maintain all rights to bring suit as if no complaint had been filed with the division.

N.Y. Exec. Law § 297(9). Thus, absent application of one of the three exceptions, the statute divests courts of jurisdiction over human rights claims which have been presented to the NYSDHR. *See York v. Association of the Bar of the City of N.Y.*, 286 F.3d 122, 127 (2d Cir. 2002); *Moodie v. Federal Reserve Bank of N.Y.*, 58 F.3d 879, 882 (2d Cir. 1995) ("a state law depriving its courts of jurisdiction over a state law claim also operates to divest a federal court of jurisdiction to decide the claim."). Plaintiff may not circumvent his selection of the NYSDHR as the forum for his complaints by presenting additional facts or defendants in this proceeding. *See Lyman v. City of N.Y.*, No. 96 Civ. 2382, 1997 WL 473976, at *4 (S.D.N.Y. Aug. 20, 1997) (assertion of additional facts or additional defendants could not create jurisdiction where claims before district court were based on the same incident as the claims raised in the administrative complaint). Accordingly, plaintiff's second, third, fifth and sixth causes of action, pursuant to New York's Executive Law, are dismissed.

**ADA Claim**

Defendants argue that plaintiff cannot establish that he suffers from a disability as defined by the ADA. Dkt. #68, p.12. Specifically, defendants argue that plaintiff's ankle injury was a temporary condition, which is insufficient to demonstrate a substantial limitation on major life activities. Dkt. #68, p.15.

The plaintiff responds that he has sufficiently alleged that he was substantially limited in a major life activity, *to wit*, walking, working and performing manual tasks. Dkt. #79, pp.25-26.

A plaintiff alleging employment discrimination under the ADA bears the initial burden of establishing a *prima facie* case. *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869 (2d Cir. 1998). To establish a *prima facie* case of discriminatory discharge, plaintiff must show that: (1) his employer is subject to the ADA; (2) he suffers from a disability within the meaning of the ADA; (3) he could perform the essential functions of his job with or without reasonable accommodation; and (4) he was fired because of his disability. *Id.* at 869-70.

The ADA defines a disability as either: (A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102. To ascertain if a plaintiff is disabled for the purposes of the ADA, the Court must consider whether the plaintiff is afflicted with a physical or

mental impairment; whether the life activity relied upon by plaintiff is a major life activity pursuant to the statute; and whether the impairment substantially limits that major life activity. *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 641 (2d Cir. 1998), *cert. denied*, 526 U.S. 1018 (1999), *citing Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). In the instant case, the Court determines that plaintiff's sprained ankle, as documented by medical professionals, constitutes a physical impairment. With respect to the second factor, the regulations implementing the ADA include walking, working and performing manual tasks as major life activities. 29 C.F.R. § 1630.2(h)(2)(i).

The regulations define the term "substantially limits" to mean: (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). In determining whether an individual is substantially limited in a major life activity, the regulations require consideration of the following factors: (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2 (j) (2). Courts must be "careful to distinguish impairments which merely *affect* major life activities from those that *substantially limit* those activities." *Ryan*, 135 F.3d at 870. Moreover, the regulations

are clear that an inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. 29 C.F.R. § 1630.2 (j) (3) (i).

"Courts within this circuit, and the vast majority of courts elsewhere which have considered the question, have held that temporary disabilities do not trigger the protections of the ADA because individuals with temporary disabilities are not disabled persons within the meaning of the act." *Murray v. Bokman, Inc.,* No. 99-CV-0051, 2001 WL 6036898, at *5 (W.D.N.Y. May 24, 2001), *quoting Graaf v. North Shore Univ. Hosp*., 1 F. Supp.2d 318, 321 (S.D.N.Y. 1998); *Huskins v. Pepsi Cola of Odgensburg Bottlers*, 180 F. Supp.2d 347, 351-52 (N.D.N.Y. 2001) (collecting cases); *see Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 198 (2002) (impact of impairment must be permanent or long term); *see also Halperin v. Abacus Tech. Corp*., 128 F.3d 191, 199 (4th Cir. 1997) ("Extending the statutory protections available under the ADA to individuals with broken bones, sprained joints, sore muscles, infectious diseases, or other ailments that temporarily limit an individual's ability to work would trivialize" the ADA's objective). Thus, in *Adams v. Citizens Advice Bureau*, the Court of Appeals for the Second Circuit affirmed summary judgment dismissing plaintiff's claim where there was no dispute that plaintiff's neck, back and knee injury was temporary, rendering him "unable to work only for three and one-half months." 187 F.3d 315, 316 (2d Cir. 1999). In reaching this conclusion, the Court of Appeals noted that in *Colwell*, it found a temporary impairment of seven months, by itself, too short in duration to be substantially limiting. *Id., citing* 158 F.3d at 646. In the instant case, plaintiff has failed to establish that he suffers from a disability within the meaning of the ADA because,

*inter alia*, the physical effects of his ankle injury were completely resolved within ten weeks. Accordingly, defendants' motion for summary judgment is granted with respect to plaintiff's ADA claim and the fourth cause of action is dismissed.

**FMLA Claim**

As an initial matter, defendants assert that plaintiff's FMLA claim must be dismissed for lack of subject matter jurisdiction because it is barred by the Eleventh Amendment to the United States Constitution. Dkt. #68, p.9.

Plaintiff argues that the NFTA is not an arm of the state and that states are subject to the FMLA in any event. Dkt. #79, p.6.

The Eleventh Amendment[2] of the United States Constitution bars suit in federal court by an individual against a state or its agencies, unless the state has waived its sovereign immunity by consenting to suit in federal court or Congress has authorized such a suit pursuant to a valid exercise of its power. *Board of Trustees of the Univ. of Alabama v. Garrett,* 531 U.S. 356, 363-64 (2001)*; College Savs. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 680 (1999); *Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). In *Nevada Dep't. of Human Resources v. Hibbs*, the United States Supreme Court held that the

[2] The Eleventh Amendment of the United States Constitution provides that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

FMLA is a valid abrogation of state immunity. 538 U.S. 721 (2003). Accordingly, the Court will consider the merits of plaintiff's FMLA claim.

In his amended complaint, plaintiff alleges that the defendants violated the FMLA by failing to notify him of his rights under the FMLA, failing to post the requirements of the FMLA, attempting to unilaterally place him on light duty while he was on protected leave, and failing to reinstate him when he was medically cleared to work within the 12 week period. Dkt. #56, ¶ 34.

In opposition to defendants' motion for summary judgment, plaintiff asserts that he has stated a valid claim of violation of the FMLA with respect to the abuse of his son by his mother and with respect to his own ankle injury. Dkt. #79, p.9.

As relevant to the instant matter, the FMLA entitles eligible employees to a total of 12 workweeks of leave during any 12-month period to care for a serious health condition of the employee's child or because of a serious health condition that makes the employee unable to perform the functions of the employee's position. 29 U.S.C. § 2612 (a)(1). The employee may elect, or the employer may require, that an employee utilize accrued paid vacation, personal, medical, sick or family leave for any portion of the leave afforded to the employee. 29 U.S.C. § 2612 (d). The statute prohibits an employer from interfering with, restraining, or denying the exercise of an employee's right to leave. 29 U.S.C. § 2615 (a). Interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such

leave." *Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004), *quoting* 29 C.F.R. § 852.220(b).

On return from FMLA leave, an employee is entitled to be restored to the position held when leave commenced or to an equivalent position with equivalent employment benefits, pay and other terms and conditions of employment. 29 U.S.C. § 2614(a)(1). An employee may commence a civil action for violations of the FMLA within two years of the alleged violation. 29 U.S.C. § 2617 (c)(1). The statute of limitations is extended to three years for willful violations. 29 U.S.C. § 2617 (c)(2). An employer acts willfully when he or she knew or showed reckless disregard as to whether its conduct was prohibited. *Porter v. New York Univ. Sch. of Law*, 392 F.3d 530, 531-32 (2d Cir. 2004).

To succeed on a cause of action for the denial of, or interference with, benefits under the FMLA, a plaintiff must establish that: (1) he is an eligible employee under the FMLA; (2) the defendant is an employer under the FMLA, as defined in 29 U.S.C. § 2611(4); (3) he was entitled to take leave under the FMLA, as defined in 29 U.S.C. § 2612(a)(1); (4) he gave notice to the defendant of his intention to take leave, as defined in 29 U.S.C. § 2612(e)(1) and 29 C.F.R. § 825.302-03; and (5) that he was denied benefits to which he was entitled under the FMLA. *Matya v. Dexter Corp.*, No. 97-CV-763, 2006 WL 931870, at *10 (W.D.N.Y. April 11, 2006).

A claim of retaliation for taking FMLA leave is analyzed pursuant to the *McDonnell Douglas* burden-shifting framework. *Sista v. CDC Ixis North America, Inc*., 445 F.3d 161, 176 (2d Cir. 2006); *Potenza*, 365 F.3d at 168. Thus, to make a *prima facie* case, plaintiff must establish that: (1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Id.*

Defendants argue that plaintiff's allegations of denial of leave prior to April 10, 1998, two years prior to the filing of his complaint, are barred by the statute of limitations. Dkt. #80, p.9. The Court agrees that plaintiff has failed to allege or demonstrate that defendants' actions with respect to plaintiff's claims of denial of FMLA rights regarding his son were reckless and are, therefore, barred by the two year statute of limitations. In addition, the Court questions whether the allegations of child neglect and abuse of plaintiff's son by his mother and custodial parent, as set forth in this record, qualifies as a serious health condition as defined by the statute. 29 U.S.C. § 2611(11) defines serious health condition as an illness, injury, impairment, or physical or mental condition that involves inpatient care in a hospital, hospice or residential medical facility or continuing treatment by a health care provider. The regulations explain that a serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

> (i) A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom)

> of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
> > (A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
> >
> > (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114 (a)(2). In the instant case, plaintiff has not come forward with medical records or other documentation to demonstrate that the child was incapacitated for more than three consecutive calendar days and plaintiff does not contradict defendants' assertions that plaintiff was afforded leave to attend to his son's medical needs as they arose. To the extent that plaintiff sought additional leave to provide basic child care in place of the inadequate care allegedly being provided by his son's custodial parent, the Court does not believe that the FMLA is applicable. Accordingly, defendants' motion for summary judgment with respect to plaintiff's allegations of denial of FMLA leave to care for his son is granted.

Turning to plaintiff's ankle injury, the Court is of the opinion that there is a question of fact as to whether defendants denied plaintiff's right to FMLA leave by ordering his attendance at the Rail Familiarization Training Session despite his physician's certification that plaintiff should remain out of work. Although Lt. Martha asserts that he wouldn't expect an officer on disability to attend training, plaintiff testified

that Lt. Martha instructed him to attend. Dkt. #67, Exh. D, p.73; Dkt. #67, Exh. C2, p.47 & Exh. E, p.66; Dkt. #77, ¶ 16. There is also a question of fact as to whether defendants' inquiry as to plaintiff's ability to perform light duty was an attempt to interfere with plaintiff's use of FMLA leave inasmuch as Lt. Martha testified that this was the only time he had ever contacted a physician regarding an officer's leave status. Dkt. #67, Exh. E, p.79. In addition, although defendants argue that plaintiff was terminated for failing to obey an order to contact Lt. Martha, there is a question of fact as to whether Lt. Martha's attempt to communicate with plaintiff and plaintiff's response to that communication was adequate and reasonable under the circumstances.

In sum, defendants' motion for summary judgment on the seventh cause of action is granted with respect to plaintiff's claim of denial of leave to care for his child and denied with respect to plaintiff's ankle injury.

**General Municipal Law § 207-c**

Defendants argue that police officers employed by the NFTA are not covered by General Municipal Law § 207-c because the NFTA is not a municipal corporation, but a public authority organized pursuant to section 1299 et seq. of the New York Public Authorities Law. Dkt. #68, p.9.

Plaintiff responds that the General Municipal Law's definitions are sufficiently broad as to include the NFTA in its jurisdiction, noting that NFTA officers are included within the Public Authorities Law's definition of police officers. Dkt. #79, p.5.

New York's General Municipal Law provides that

> Any sheriff, undersheriff, deputy sheriff or corrections officer of the sheriff's department of any county (hereinafter referred to as a "policeman") or any member of a police force of any county, city of less than one million population, town or village, or of any district, agency, board, body or commission thereof, or a detective-investigator or any other investigator who is a police officer pursuant to the provisions of the criminal procedure law employed in the office of a district attorney of any county, or any corrections officer of the county of Erie department of corrections, or an advanced ambulance medical technician employed by the county of Nassau, or any supervising fire inspector, fire inspector, fire marshal or assistant fire marshal employed full-time in the county of Nassau fire marshal's office, or at the option of the county of Nassau, any probation officer of the county of Nassau who is injured in the performance of his duties or who is taken sick as a result of the performance of his duties so as to necessitate medical or other lawful remedial treatment shall be paid by the municipality by which he is employed the full amount of his regular salary or wages until his disability arising therefrom has ceased, and, in addition such municipality shall be liable for all medical treatment and hospital care necessitated by reason of such injury or illness.

N.Y. Gen. Muni. Law § 207-c. The NFTA is not a county, city, town or village, nor is it a district, agency, board, body of commission of a county, city, town or village. To the contrary, the NFTA is a "body corporate and politic constituting a public benefit corporation." N.Y. Public Authorities Law § 1299-c(1). As a result, it matters not that the legislature has empowered the NFTA to appoint or designate "Niagara frontier transportation authority security officer or patrolman" and has included these officers within the definition of police officers set forth by New York Criminal Procedure Law § 1.20 (34). N.Y. Public Authorities Law § 1299-e(13). If the legislature intended to incorporate any police officer included within New York's Criminal Procedure Law into the definition of General Municipal Law § 207-c, it would not have limited the scope of

General Municipal Law § 207-c to a "detective-investigator or any other investigator who is a police officer pursuant to the provisions of the criminal procedure law employed in the office of a district attorney of any county." N.Y. Gen. Muni. Law § 207-c. Accordingly, plaintiff's eighth cause of action is dismissed.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that defendants' motion for summary judgment (Dkt. #67), is **GRANTED IN PART** and **DENIED IN PART.**

As appointed counsel for the plaintiff no longer practices in this district, the Clerk of the Court is directed to mail a copy of this Decision and Order directly to the plaintiff.

**SO ORDERED.**

DATED: Buffalo, New York
July 31, 2007

**S/ H. Kenneth Schroeder, Jr.**
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**